IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CLEVELAND LEE,

                Petitioner,

    v.

JOHN PAQUIN, Warden,
Prairie du Chien Correctional Institution,

                Respondent.

OPINION AND
ORDER

08-cv-697-bbc

---

    This is a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Cleveland Lee, an inmate at the Prairie du Chien Correctional Institution, is challenging the lawfulness of his conviction in the Circuit Court for Milwaukee County on two counts of theft of more than $2,500 from a business, 10 counts of forgery and uttering and three counts of filing false and fraudulent tax returns. On September 17, 2009, I entered an order dismissing for lack of exhaustion four of the seven claims on which petitioner was authorized initially to proceed. Op. and Order, Sept. 17, 2009, dkt. 28. The petition is now before the court for a decision on the remaining three claims:

1)     petitioner's due process rights were violated by the circuit court's decision not to admit a business plan that petitioner did not disclose until the last day of trial in violation of Wisconsin's criminal discovery statute;

2)     trial counsel rendered ineffective assistance of counsel by not objecting to the testimony of Agent Vern Barnes on the grounds that it improperly invaded the province of the jury; and

3)     petitioner's due process rights were violated by the cumulative effects of these errors.

As discussed below, petitioner is barred procedurally from bringing his due process claim in this court because he failed to fairly present it to the state courts.  His claim of ineffectiveness of counsel fails because he has not shown that the state courts' resolution of this claim violated the requirements of § 2254(d).  Finally, because petitioner has failed to demonstrate that more than one error was committed during his trial, he cannot prevail on a cumulative effect theory.  For these reasons, he is not entitled to federal habeas relief.

The factual determinations of the state court are presumed correct.  28 U.S.C. § 2254(e)(1); Sumner v. Mata, 449 U.S. 539, 547 (1981).  I have adopted nearly verbatim the facts as presented in the Wisconsin Court of Appeals' unreported opinion, State v. Lee, 2007 WI App 230, 306 Wis. 2d 125 (unpublished disposition), dkt. #12, Exh. 5, at 13, which petitioner has not disputed in his petition.

## FACTS

In January 2005, petitioner Cleveland Lee was charged with fifteen felonies:  two counts of theft of more than $2500 from a business (occurring from January 1, 1998 to March 30, 2002); ten counts of forgery and uttering (occurring from September 21, 1999 through January 24, 2002); and three counts of filing false and fraudulent tax returns, as a party to a crime (involving Wisconsin income tax returns for 1999, 2000, and 2001).  The charged crimes took place between 1998 and 2002, when petitioner was chief financial officer of the Harambee Community School, a nonprofit organization.

Petitioner had been a long-time volunteer member of the school's board.  He became the treasurer during the 1984-85 school year, then business manager during the 1985-86 school year

and later officer of operations, chairman of the finance committee, and the chief financial officer of the school.   In 1991, he moved to Houston, Texas and commuted to Milwaukee approximately twice a month.   His involvement with the school continued.   Between approximately January 1998 and March 2002, he controlled two Harambee Community School bank accounts:  the "hot lunch" account and the "child care" account.  Petitioner shared signing authority on the school's  "general" account with Dorene Cotton-Woods, the assistant business manager at the school.  (At the time of trial, Cotton-Woods had married and changed her name to Taylor.)  Petitioner hired the accountant who prepared financial statements for the board, after the board president approved petitioner's hiring of an accountant.  Petitioner's involvement with the school ended in January 2002.

The "general" account received money from school tuition, private donors, public school voucher funds and public school lunch funds.   The "general" account was used to pay "everything you would take to run a school," and to pay for the "day care operation" at the school.  In addition, payments were made from the "general" account to petitioner personally, to three corporations he owned and to the "hot lunch" account.

The "hot lunch" account received tuition money for computer training in the technology center at the school.  Tuition was paid by private individuals who wanted computer training and by corporations that wanted their employees trained.  The "hot lunch" account made payments to petitioner personally and to three corporations he owned.

The school "child care" account received payments from W-2 and from private-pay clients for the child care program at the school.  The school "child care" account made payments to petitioner personally and to the three corporations he owned.

During petitioner's tenure as treasurer and chief financial officer, neither the school's "child care" account nor the "hot lunch" account appeared on the financial statements prepared by accountants for the board.  Cotton-Woods testified that petitioner maintained those two accounts and gave her a directive that he would handle the "child care" account.  Petitioner also maintained the "hot lunch" account records, which Cotton-Woods believed was an account that had been closed.

The corporations and their bank accounts subject to Lee's sole control were:  Pull Together Publishing, often referred to as "PT Publishing," (which had two accounts, one in Wisconsin and one in Texas); Metropest, later known as Metroserve ("MP/MS") (which also had two accounts, one in Wisconsin and one in Texas); and "Harambee Child Care, Inc." (which appears to have had only one Wisconsin account).    Petitioner was the only person who had authorized access to the funds in the bank accounts for PT Publishing, MP/MS or Harambee Child Care, Inc., and he was the maker of all checks paid out of the Harambee Child Care, Inc. account.

The state's theory of the case was that petitioner kept the school "child care" and "hot lunch" accounts a secret from others involved in the school, and that he secretly moved more than ninety percent of the money paid into those two accounts into his solely-owned corporations or to himself directly.  This theory was based in part on documents and in part on expert testimony.  Sandra Matthews, a certified public accountant, was hired by one of the school's benefactors to reconstruct the school's financial records after the auditor advised the school that the records were in such a condition that an audit could not be done.  The school's board of directors hired Patrick Brady, a specialist in forensic accounting investigations and a

4

former federal and state prosecutor, to review all three school accounts and the significant, undocumented payments from those accounts.  Vern Barnes, a special agent with the Wisconsin Department of Revenue, and a certified public accountant, was assigned to review of Lee's 1999, 2000 and 2001 income tax returns, which had been requested by the Milwaukee County District Attorney.

Matthews explained that when she started working at the school in April 2002, the condition of the school's financial records prevented her from auditing them.  Matthews focused her attention on the records for 2001 and the first half of 2002.  She testified that she saw no indications that the business office had been broken into.  She explained that for the "hot lunch" account and the "child care" account, she was unable to find any bank statements, bank reconciliations or copies of cancelled checks, although her search included the school's business office, all file cabinets, the various storage areas in the school, previous year boxes of records and a nearby house that the school rented.  The only record found for the "hot lunch" account was a checkbook with blank checks and stubs from prior checks that were also blank, and one or two returned checks in the bottom of a file cabinet drawer.  On the shool computer, Matthews found a check register for Harambee Child Care, Inc.

Matthews obtained copies of the bank statements for all of the school accounts for a period of twelve to eighteen months.  Noticing large amounts on many checks reported on the statements, she next obtained copies of the bank microfiche records of those large checks, which totaled approximately $160,000 to $200,000 for the period of time Matthews was examining. She found some invoices regarding payments made from the school's "general" account to PT Publishing and MP/MS; however, Matthews was unable to find any back-up documentation of

any sort for any of the checks made payable to petitioner, PT Publishing, MP/MS or Harambee Child Care, Inc. from either the school's "child care" account or "hot lunch" account.

Matthews testified that the school's financial statements for 2000 and 2001 showed no income to the school from its child care operations or from its adult computer classes.  Further, although the financial statements disclosed the school's "general" account, the statements did not disclose either the school's "hot lunch" account or its "child care" account.

Barnes described his detailed review of the records of all three of the school's bank accounts and all of the bank accounts (Wisconsin and Texas) for MP/MS, PT Publishing and Harambee Child Care, Inc., as well as petitioner's personal bank account.  Barnes described the school's "general" account as paying "everything you would take to run a school" and also paying for "the day care operation that was also held there."  Barnes acknowledged that payments were made from the "general" account, with supporting invoices, to PT Publishing for books and other materials, and to MP/MS for bug extermination.  Barnes described two categories of recurring invoices from MP/MS.  Each month an invoice for "management services and food management services," totaling $1800, was paid.  In addition, starting at the end of 1999 or in early 2000 through the end of 2001, an invoice totaling $8300 was paid each quarter for school projects that petitioner was supervising.

Barnes explained that the technology center income went directly into the "hot lunch" account, then was paid out almost in total to PT Publishing, MP/MS, Harambee Child Care, Inc. or to petitioner personally.  From January 2000 through March 2002, payments totaling $85,494 for computer training were deposited in the school's "hot lunch" account.  During that

same time, a total of $77,103 was paid out of the account to: petitioner personally ($11,750), PT Publishing ($28,076), MP/MS ($12,352), and Harambee Child Care, Inc. ($24,925).

Barnes's review of the checks disclosed a similar pattern with the shool's "child care" account. This account received all the funds for child care services from W-2 and private-pay clients. The funds were then paid to PT Publishing, MP/MS, Harambee Child Care, Inc. or petitioner personally. Between January 2000 and March 2002, the school's "child care" account paid out a total of $410,627. Of that amount, petitioner and corporations he controlled were paid $387,667, with petitioner personally receiving $22,821, PT Publishing receiving $66,758, MP/MS receiving $32,360, and Harambee Child Care, Inc. receiving $265,728.

Barnes described Harambee Child Care, Inc. as being used to funnel money out of both the school "child care" account and the "hot lunch" account. However, Barnes indicated that none of the checks paid by Harambee Child Care, Inc. were consistent with a "real child care business." He observed that there was no payroll for child care staff and no payments for supplies that one might expect with a day-care operation, such as for diapers or snacks. Rather, Barnes found that the Harambee Child Care, Inc. account was used to pay bills at Hooters in Houston, Texas; at Solid Gold Jewelry, in Houston, Texas; at gas stations in Houston and Palmer, Texas; as well as MSN on-line billing and Price Line. He provided other examples of Harambee Child Care, Inc. checks, signed by petitioner, which included monthly payments to GMAC of $567.90 and to Ford Credit of $286.65. In addition, there were payments from Harambee Child Care, Inc. to Fleet Mortgage and Midland Mortgage, although there is no evidence that Harambee Child Care, Inc. owned any property likely to be the security for a mortgage. Barnes concluded that Harambee Child Care, Inc. "is basically the alter ego of

7

Cleveland Lee.  It's the same as Cleveland Lee. . . . The corporation is nothing more than a shell

or a conduit to funnel money embezzled from Harambee school accounts and into particular

accounts controlled by Cleveland Lee."

Relying on his experience as a certified public accountant and as an agent of the

Wisconsin Department of Revenue, Barnes calculated the total amount taken by petitioner to

be $644,000. Barnes explained that the questioned checks were "taxable income and they were

not reported." He elaborated:

> I came to the inescapable conclusion that Mr. Lee transferred huge sums of money-hundreds of thousands of dollars from these two school accounts, the hot lunch account and the child care account into either his own personal account or to other bank accounts that he controlled in the names of Metro Pest or PT Publications [sic].

> Sure PT Publications [sic] and Metro Pest were real companies, provided real services and issued real invoices for either books or brochures or for bug extermination, but they were paid real money— separate money for these services or products[. T]hat left the rest of the money, hundreds of thousands of dollars, for which there were no invoices and for which there were no apparent products or services rendered.

> .     .     .

> At the point that Mr. Lee took control of that money he had what we call unfettered use, total dominion, complete control over that money.  At that point he can direct it to wherever he wants to . . . and that's the point that we would say is taxable income to him.

For the years involved in the complaint, Barnes described in considerable detail various

entries on each of the income tax returns that petitioner filed personally and on behalf of the

corporations he controlled.  Barnes calculated the amount of income he believed was actually

received and the amount of tax that would have been due on that income for each of the years

in question. Barnes summarized his conclusions:

> I reached a conclusion that Mr. Lee embezzled substantial amount of monies from the two school accounts at Harambee Community School, the hot lunch account and the child care account.

> Concluded also that he filed Wisconsin income tax returns for the 1999, 2000 and 2001 years that did not include embezzled funds nor did it include the money received from Metro Pest or Metroserv [sic].

> Therefore I concluded that he's filed false and fraudulent Wisconsin income tax returns for those years with the intent to evade the taxes due.

During cross-examination, Barnes agreed with defense counsel that it was the jury's opinion and

not his that mattered.

After the state had presented its witnesses, petitioner's counsel disclosed to the state a

business plan for Harambee Child Care, Inc., that counsel stated he had received within the

previous half hour.   Petitioner represented that the business plan had been typed by

Cotton-Woods and that it was offered both as rebuttal to, and impeachment of the testimony

of Cotton-Woods and Alexander that they were unaware of the existence of Harambee Child

Care, Inc.   No dates appeared in the text of the plan or as other identifying information

anywhere on the document.   The business plan referred to Cotton-Woods and Alexander as

officers of Harambee Child Care, Inc.   The state objected to the document because it had not

been produced during discovery.   The trial court refused to allow the business plan as evidence,

saying:

> [COURT TO DEFENSE COUNSEL]: You have a right to present your case, but we don't have trial by ambush.... The state made its discovery demand. This was just handed to you by your client. I don't know if he had it earlier. I don't know when this was typed up or how long it's been around or where it's been. He has

9

a right to testify as to anything he wants, but I'm not gonna have him testify that he had this plan and then introduce the plan. . . .

I think it would prejudice the state.  They would have to get this document to their witnesses who have to look at it and then they might have to call them in rebuttal.  It will delay the trial also because all the witnesses will have to be contacted.... The state would be prejudiced, the court would be prejudiced in the sense of the economic efficiency of trying cases.  That's why we have discovery motions.  This document will not be introduced.

Except for prohibiting reference to the business plan, the trial court did not otherwise limit petitioner's testimony about his belief that Cotton-Woods and Alexander were aware of the existence of Harambee Child Care, Inc.  Neither at the time the business plan was presented to the state during trial, nor after the trial court's ruling on its admissibility, did either the state or petitioner move for an adjournment.

Petitioner testified in his own behalf.  He explained that he decided to use the technology center income and the child care income to implement the new African Center curriculum the board had decided to establish.  His theory of defense was that he was authorized by Tommy Alexander, the board president, to use all of the money that he moved into the Harambee Child Care, Inc. account, or that he paid from the "general" account to himself, or to the other corporations he controlled, because the payments were for "goods or services," or repayment of loans petitioner had made to the School or for reimbursement to petitioner of the costs of his travel between his home in Houston and the school in Milwaukee.  Petitioner explained that because the school operated "like a family," there was no requirement for invoices, bills, notes for the debts or other similar records.  He said that the board did not require advance approval of specific expenditures once Alexander had given general directions or general authority.

10

Petitioner testified that he had been given authority to reimburse himself for his travel expenses when he thought the school could afford it.

Cotton-Woods became the school's business manager when petitioner moved to Texas. Petitioner testified that he and Cotton-Woods had adopted the practice of signing the other's name to checks as a convenience since he was often not in Milwaukee, and she was occasionally not available. Petitioner agreed that he never signed Cotton-Woods's name on a "general" account check. He agreed that the only time he signed Cotton-Woods's name was when he wrote checks from the "hot lunch" account or the "child care" account, to Harambee Child Care, Inc., and that on two specific days when he signed her name to one of those accounts, she was in the office and signed her own name on "general" account checks.

Petitioner explained that he had formed Harambee Child Care, Inc. in 1997 as a corporation because he had been told the school needed to separate the child care operation from the school. He agreed that he signed every check written on the Harambee Child Care, Inc. account. Petitioner claimed that both Alexander and Cotton-Woods knew about Harambee Child Care, Inc. because they were officers of the corporation. Alexander testified that petitioner had never mentioned Harambee Child Care, Inc. at any board meeting. The state produced copies of the reports petitioner had filed with the Wisconsin Department of Financial Institutions for Harambee Child Care, Inc., which named only petitioner as involved with the corporation.

Petitioner said that a break-in to his office at the school occurred shortly after he left in January 2002, but that he did not disclose it to anyone because he considered it related to some ongoing internal disputes. He claimed that whoever broke in had taken the records

11

involved in the accounts in question during the time involved in the criminal complaint. Petitioner's general explanation for the large transfers of funds documented by the checks produced by the state was that the money was needed for goods and services related to development of the African Center curriculum or for the "capital campaign" that petitioner was assigned to head in October 1998. Petitioner did not provide third-party corroboration for any specific expenses for curriculum development or the capital campaign. Nor was there documentation of travel expenses incurred, loans made or specific amounts and times when all or parts of such items were repaid.

In its instructions to the jury, the court included the following:

Usually a witness can testify only to facts they know, but a witness with expertise in a specialty may give an opinion in that specialty. In determining the weight to be given an opinion, you should consider the qualifications and credibility of the expert and whether reasons for the opinion are based upon facts in this case.

Opinion evidence was admitted in this case to help you reach a conclusion. You are not bound by an expert's opinion.

The jury convicted petitioner on all counts. He was sentenced to a combination of concurrent sentences, the net impact of which totaled seven years of initial confinement followed by six years of extended supervision. He filed a post conviction motion for a new trial, basing it on several different claims, but it was denied.

After post conviction proceedings in the trial court, petitioner filed an appeal raising the following claims: 1) his trial lawyer had been ineffective for failing to object to Agent Barnes's statement that Lee had filed false tax returns with the intent to evade the taxes due; 2) the trial court had abused its discretion when it refused to permit Lee to introduce the

"business plan" that had not been disclosed previously to the state; and 3) he was entitled to a new trial because of plain error or in the interests of justice.  In a decision issued September 25, 2007, the Wisconsin Court of Appeals rejected his claims and affirmed his conviction.  State v. Lee, 2007 WI App 230, 306 Wis. 2d 125 (unpublished disposition), Dkt. #12, Exh. 5, at 13.

Addressing petitioner's argument that his trial lawyer had been ineffective, the court of  appeals applied the two-part test set forth in Strickland v. Washington, 466 U.S. 668, 690 (1984).  Lee, 2007 WI App 230, ¶¶ 29-30.  Considering whether counsel's performance had been deficient, the court found that Barnes's statement was an impermissible legal conclusion that should have triggered an objection by defense counsel.  Id. at ¶33.  However, the court found that Lee was not prejudiced by this omission  because the word "intent" was used only once and was not mentioned in the state's closing argument.  Id. at 34.  In addition, the court noted that defense counsel had diffused the weight of Barnes's statement on cross-examination and the trial court had instructed the jury on the weight to be given the expert's opinion.  Id.  Overall, the court found that, in light of the substantial evidence presented by the state showing that petitioner had failed to report significant income, the error was not prejudicial.  Id.

The court rejected petitioner's claim that the trial court had abused its discretion when it refused to permit petitioner to introduce the business plan for Harambee Child Care, Inc., finding that the court had applied the proper legal standards, examined the relevant facts and demonstrated a rational decision-making process.  Id. at ¶¶ 39-40.  The court also

rejected petitioner's claim that he was entitled to a new trial in the interests of justice, finding that the state had proven beyond a reasonable doubt that the outcome would not have been different even without Barnes's reference to petitioner's "intent" and that the business plan did not contain anything supporting petitioner's contention that other officers at the school knew of the plan or of the existence of Harambee Child Care, Inc. Id. at ¶¶ 45-46.

On January 22, 2008, the Wisconsin Supreme Court denied petitioner's petition for review.


OPINION

I. Procedural Default

Petitioner argues that his due process rights were violated by the circuit court's decision not to admit the business plan that he did not disclose until the fourth day of trial. The state responds that petitioner procedurally defaulted on this claim because he did not raise it in state court. According to the state, petitioner argued only that the trial court had abused its discretion in excluding the evidence and did not argue that his constitutional rights were violated.

In order to satisfy the exhaustion requirement, a petitioner must "fairly present" his claims to the state courts. Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam); Chambers v. McCaughtry, 264 F.3d 732, 737 (7th Cir. 2001); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("[T]he exhaustion doctrine is designed to give the state

courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts."). That is, "[a] petitioner must provide the state courts with a fair opportunity to apply constitutional principles and correct any constitutional error committed by the trial court." <u>Bocian v. Godinez</u>, 101 F.3d 465, 469 (7th Cir. 1996) (quotation omitted). In order to meet the "fair presentment" precondition to exhaustion, "[t]he petitioner must have placed both the operative facts and the controlling legal principles before the state courts." <u>Chambers</u>, 264 F.3d at 737-38 (internal citations omitted). "A mere passing reference to a constitutional issue certainly does not suffice." <u>Id</u>. at 738. A petitioner's failure to fairly present his federal claims to the state courts is a procedural default that bars this court from considering the merits of the claims. <u>Id</u>.

Courts should consider four factors in deciding whether a petitioner has fairly apprised the state courts of the constitutional nature of his claim: 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases that apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. <u>Anderson v. Benik</u>, 471 F.3d 811, 815 (7th Cir. 2006) (citations omitted). However, mere similarity of state and federal claims is not enough to exhaust. <u>Duncan</u>, 513 U.S. at 366. As the Supreme Court has explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only

in federal court, but in state court." Id. See also Baldwin v. Reese, 541 U.S. 27, 32 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'").

At trial, petitioner did not mention due process or the Constitution when seeking to introduce the business plain or in response to the court's order excluding it.  In his motion for post conviction relief in the trial court, he stated that the remedy of excluding the exhibit was too harsh and "substantially affected Mr. Lee's Constitutional Right of Due Process." He also asserted that instead of excluding the exhibit, a recess or continuance would have been "a fair remedy and not affected Mr. Lee's Sixth Amendment Right to a fair trial." Dkt. #12, Exh. 2, at 9.

In his appellate brief, petitioner argued that the state court's exclusion of the business plan was an abuse of discretion.  The only references he made to due process in his appellate brief  were as follows:

> The undersigned submits that the remedy that the Court imposed was too harsh and substantially affected Lee's Constitutional Right of Due Process.

He also stated,

> Lee would submit that the trial court erred in its decision on this exhibit and as a result affects Lee's Constitutional Rights to a fair trial.

Dkt. #12, Exh. 4, at 32.  In addition, petitioner argued that he was entitled to a new trial in the interests of justice.  In his reply brief, petitioner argued only his ineffective assistance of counsel claim and did not raise any arguments in support of his other claims.

Apart from the throw-away catch phrases noted above, petitioner did not refer to any federal cases or law to alert the state courts that he sought to present a federal law claim.  He did not label any argument "federal" or develop any argument that his constitutional rights were violated.  Further, the court of appeals addressed his claims only as brought under state law.  Under these circumstances, I am not convinced that petitioner sufficiently alerted the state courts that he was raising a federal constitutional claim as opposed to a state law claim.  Accordingly, because petitioner has not attempted to meet either the cause-and-prejudice or miscarriage-of-justice exceptions to the procedural default rule, I find that he has procedurally defaulted this claim.  Perruquet v. Briley, 390 F.3d 505, 514 (7th Cir. 2004) (when petitioner has failed to fairly present to state courts his claim and his opportunity to raise claim in state court has passed, he has procedurally defaulted claim).

Even if petitioner had properly presented his due process claim to the state courts, I would deny it on the merits.  Although the exclusion of evidence can violate a defendant's right to present a defense, this right is not absolute.  Taylor v. Illinois, 484 U.S. 400, 410-11 (1988); Morgan v. Krenke, 232 F.3d 562, 569 (7th Cir. 2000).  "[T]he exclusion of even relevant evidence does not automatically create a due process violation," because "states retain the right, also not absolute, to establish procedures for running their criminal trials." Morgan, 232 F.3d at 569; see also Holmes v. South Carolina, 547 U.S. 319, 324 (1986);

17

United States v. Scheffer, 523 U.S. 303, 308 (1998).  Defendants must comply with state procedural and evidentiary rules designed to assure both fairness and reliability.  Chambers, 410 U.S. at 302.  Such rules do not violate an accused's right to present a defense unless they are "arbitrary or disproportionate to the purposes they are designed to serve."  Holmes, 547 U.S. at 324-25; Scheffer, 523 U.S. at 308.  Thus, "[w]hile the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose . . . , well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors, such as unfair prejudice, confusion of the issues, or the potential to mislead the jury."  Holmes, 547 U.S. at 326-27.  A trial judge has "wide latitude" to apply these evidentiary rules before running afoul of the Constitution.  Crane v. Kentucky, 476 U.S. 683, 689-690 (1986).

Wisconsin's discovery statute, Wis. Stat. § 971.23(7m), provides that "[t]he court shall exclude any witness not listed or evidence not presented for inspection or copying required . . ., unless good cause is shown for failure to comply."  There is no dispute that petitioner's late disclosure of the business plan was in violation of the discovery statute and that he failed to offer a good reason for his delay.  As the trial court recognized, introduction of the plan mid-way through trial would have prejudiced the state, which had just finished presenting its case and would have to show the plan to its witnesses and recall Alexander and Cotton-Woods, who testified that they were not aware of the existence of Harambee Child Care, Inc.  The court pointed out that the document had little probative value, insofar as it was not signed by Alexander or Cotton-Woods and had nothing on it to indicate when or

18

by whom it was prepared or whether Alexander or Cotton-Woods had ever seen it.  On the other hand, petitioner was allowed to testify that Cotton-Woods and Alexander knew about Harambee Child Care and to explain the basis for that testimony.   Under these circumstances, the trial court's decision to exclude the evidence was not arbitrary or disproportionate to the purposes behind the discovery statute.  Petitioner was not deprived of his constitutional right to present a defense.

## II.  Ineffective Assistance of Counsel

Federal courts may grant a state prisoner habeas relief on a claim decided on the merits by the state courts only if the state courts' adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To grant habeas relief under the "contrary to" clause, a federal court must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405 (2000); Jackson v. Miller, 260 F.3d 769, 774 (7th Cir. 2001).   To obtain relief under the "unreasonable application" clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such precedent to a

context where it should have applied.  Jackson, 260 F.3d at 774.  To prevail on this prong, a petitioner must show that the state court's decision was so erroneous as to be objectively unreasonable, that is, well outside the boundaries of permissible differences of opinion. Emerson v. Shaw, 575 F.3d 680, 684 (7th Cir. 2009).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-part test for determining whether a criminal defendant is entitled to a new trial because of his lawyer's mistakes.  First, the defendant must show that his trial counsel's performance fell below an objective standard of reasonableness.  Second, he must show that he was prejudiced by counsel's errors.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

On habeas review, the bar is even higher:  the petitioner must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance; he must show that the state courts applied Strickland to the facts of his case in an objectively unreasonable manner.  Bell v. Cone, 535 U.S. 685, 698-99 (2002).  Showing that a state court applied Strickland unreasonably is extraordinarily difficult because Strickland calls for inquiry into degrees.  This means that only a clear error in applying Strickland's standard will support a writ of habeas corpus.  Holman v. Gilmore, 126 F.3d 876, 882 (7th Cir. 1997); see also Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009)("the question is not whether a federal court believes that the state court's determination under the Strickland

standard was incorrect but whether that determination was unreasonable—a substantially higher threshold").

The court of appeals recognized that <u>Strickland</u> provided the test governing petitioner's claim of ineffective assistance of counsel. Applying the first part of the test, the court found that petitioner's counsel had performed deficiently by not objecting to the statement made by Agent Barnes regarding petitioner's "intent" to evade income taxes. The court found, however, that petitioner had not been prejudiced by this error. It reasoned that

> The offending remark occurred in the final portion of Barnes's testimony about a complex series of financial maneuvers, culminating in Lee filing tax returns that did not reflect any of the substantial payments Lee and his companies received from the School accounts. Barnes was reciting his conclusions based on his review of the records and used the word "intent" only once. Neither Barnes's use of the word "intent," nor the phrase on which Lee focuses in this appeal was mentioned in the State's closing argument. Lee's counsel properly obtained Barnes's admission, on cross-examination, that the jury's opinion was the only opinion that mattered. The trial court reinforced that truism by instructing the jury that it was not bound by an expert's opinion. Based upon the record, we conclude that Lee was not prejudiced by counsel's failure to object because in light of the substantial evidence of significant unreported income, the error was not "so serious as to deprive [him] of . . . a trial whose result is reliable."

<u>State v. Lee</u>, 2007 WL 2768464, 9(Ct. App. 2007), ¶34 (internal citations omitted).

Applying the standards set out above, I am satisfied that the state court of appeals' review of petitioner's claim was reasonable. The court relied upon the proper federal standards and carefully reviewed the record to determine whether counsel's failure to object to Barnes's testimony affected the outcome of the trial. In light of the substantial evidence that petitioner had received large sums of funds from the school, that he had failed to report

on his income taxes, Barnes's admission that the jury was to decide the question of intent and the court's instruction to the jury regarding expert opinions, reasonable jurists could agree that petitioner had failed to show a reasonable probability of a different outcome had his lawyer objected to Barnes's statement. Accordingly, because the state appellate court took plaintiff's claim seriously and reached a decision that was well within the boundaries of permissible differences of opinion, petitioner is not entitled to habeas relief on this claim.

## C.  Cumulative Error

Petitioner has alleged that the cumulative effect of the errors committed at his trial effectively denied him a fair trial. (In his petition, petitioner identified one of these errors as improper statements by the prosecutor during closing argument. In the September 17, 2009 order, I dismissed petitioner's prosecutorial misconduct claim with prejudice because petitioner had failed to exhaust it in state court. Accordingly, because there is no claim of prosecutorial misconduct before the court, I do not consider it as part of the cumulative error analysis.) To prevail on this theory, petitioner must show that at least two errors were committed in the course of the trial. Alvarez v. Boyd, 225 F.3d 820, 824-25 & n.1 (7th Cir. 2000) (assuming without deciding that claim of "cumulative effect" is cognizable on federal habeas). But see Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error not cognizable on federal habeas because Supreme Court has not spoken on issue); Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than

collectively); <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). Petitioner has shown only one error: the failure of his lawyer to object to Barnes's statement. Accordingly, he cannot prevail on a cumulative effect theory.


D.  <u>Conclusion and Certificate of Appealability</u>

In sum, petitioner failed to properly present his due process claim to the state courts and has failed to show that the court of appeals unreasonably applied clearly established federal law in rejecting his ineffective assistance of counsel claim. Accordingly, his petition for a writ of habeas corpus must be denied.

The only question remaining is whether to grant a certificate of appealability to petitioner. Under Rule 11 of the Rules Governing Section 2254 Cases, I must issue or deny a certificate of appealability when entering a final order adverse to petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

Although the rule allows a court to ask the parties to submit arguments on whether a certificate should issue, it is not necessary to do so in this case because the question is not

close.  Even if it was debatable whether petitioner fairly preserved his due process claim, on this record reasonable jurists would not disagree that the trial court did not violate petitioner's right to present a defense when it rejected his eleventh-hour attempt to introduce a suspicious document that had not been produced in response to the state's discovery request.  Nor would reasonable jurists debate that in failing to object to the one remark by Agent Barnes regarding petitioner's "intent," petitioner's lawyer did not commit an error so grievous that it was reasonably likely to have changed the outcome at trial.  Had the objection been raised, the court would likely have ordered the answer stricken and instructed the jury that it was not bound by an expert's opinions, which was the same instruction it gave the jury later.  The state adduced overwhelming evidence at trial showing that petitioner embezzled significant sums of money for which he failed to pay income tax. Petitioner has failed to make a substantial showing of the denial of a constitutional right.


ORDER

IT IS ORDERED that the petition of Cleveland Lee for a writ of habeas corpus is DENIED and petitioner is DENIED a certificate of appealability.  Petitioner may seek a certificate from the court of appeals under Fed. R. App. P. 22.

Entered this 18th day of March, 2010.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge